ALLEN DANFORTH & others *vs.* JOSEPH ALLEN & others.

Numerous persons subscribed a paper stating that, in order to facilitate the communica
tion between Boston and Plymouth, it was necessary that a steamboat should be
employed, and a wharf erected in Plymouth, the cost of which was estimated at
$10,000; and in order to carry this object into effect, they promised to take the
number of shares set opposite to their names, and pay for each share $100 to
such person as might be appointed by a majority of interest, and that a meeting
of the subscribers might be called, to organize the company, by any two of them,
whenever the sum of $8000 should be subscribed: After 890 shares were sub
scribed for, a meeting of the subscribers was called, at which three of their num
ber were appointed a committee, with full power to collect the money subscribed,
and to carry into effect, at their discretion, the objects of the association: This
committee collected $8900, and expended a larger sum, which they advanced from
their private funds, in the purchase of a steamboat, an old wharf, and the flats
adjoining, of which they took a conveyance to themselves personally, and in the
erection of a new wharf and stores thereon, and in running the steamboat between
Plymouth and Boston: Before said boat, wharf and flats were so purchased, said
committee and A., B. & C. executed a sealed instrument, in which it was recited
that said committee might find it necessary to contract debts, on account of said
wharf and steamboat, over and above the amount subscribed for that purpose, and
in which A., B. & C. agreed, that if the contracts of said committee should

exceed the amount subscribed, they would pay to said committee one half of such excess; and it was also a part of said agreement that the contemplated advances should be paid equally by said committee and said A., B. & C., and that all profits or losses, arising from such advances, should be divided or borne equally by said committee and said A., B. & C.: Upon closing the concerns of the association, it was found that the committee had expended more than $12,000 beyond the earnings of the boat and the $8900 received by them of the associates: The committee thereupon filed a bill in equity against the original subscribers, to compel them to contribute to the payment of said advances.

*Held,* that the original subscription did not bind the subscribers to pay more than $100 on a share; that the committee had no authority to make advances so as to charge the subscribers with a larger sum; that the advances, made by the committee, were not made on account of the original subscribers, but solely on their own account, or on account of themselves and of A., B. & C.; and that the bill could not be sustained.

THIS was a bill in equity, in which James Bartlett, and the administrators of James Spooner and of Jacob Covington, alleged that he and their intestates, on the 3d of July 1828, agreed with the defendants to form a company for the purpose of facilitating the communication between Boston and Plymouth, and, in order thereto, agreed to purchase a steamboat and erect a wharf in Plymouth, at a cost of $10,000 : That said intestates and the defendants, in pursuance of said agreement, on said 3d of July entered into a written agreement to take a certain number of shares each, and pay $100 for each share to the agent of the company, and that the company should be organized whenever $8000 should be subscribed : That each of said intestates and defendants subscribed for a certain number of shares, (mentioned in the bill :) That after $8900 were subscribed, viz. on the 5th of August 1828, said intestates and defendants met in Plymouth, and organized the company, after due notice to each one of said associates ; at which meeting, a majority in interest of said associates were represented : That after said organization, the associates chose the plaintiff Bartlett and said intestates a committee, and gave them full power to collect the money of the subscribers, and to carry into effect the objects of the association, according to said committee's discretion : That said committee accepted the office, and collected the subscription money, (including the sums subscribed by themselves,) to the amount of $8900 : That said committee, in August 1828, for the purposes of said association, purchased a

steamboat, called the Lafayette, for $4025, and in September following, purchased of Thomas and William Jackson, for $3000, an old wharf and the contiguous flats, and erected a wharf, running out into deep water, at a cost of $7500, suitable and necessary for the purposes of the association: That all these acts were well known to said associates, and approved by them ; and that, under these arrangements, said steamboat ran between Boston and Plymouth, transporting passengers and merchandize, till the autumn of 1830 :   That on the 22d of March 1831, in consequence of the unprofitableness of the business, and the great excess of the debts of the partnership over and beyond the property, and of the large sums advanced by said committee beyond their share of the loss, the associates met and voted to close the business, and chose a committee to sell the wharf and steamboat ; and that the steamboat, with her apparatus, was sold at auction for $1040, which sum went into the committee's hands :   That authority to sell the wharf was not given by the associates till December 30th 1833, when, at a meeting, they by vote requested the committee to sell the wharf, flats, and stores, at auction, in not less than five lots: That the committee failed of success in selling the same, and that the same still remain unsold.

The plaintiffs further alleged, in their bill, that in purchasing said boat, and the flats for a wharf, and in building the wharf, and in running the boat, according to the desire and direction of the associates, and their own best discretion, the said Bartlett, Spooner and Covington, as such committee, made large advances to the partnership, out of their own private funds, viz. $12,356·76, over and beyond the $8900 above mentioned, and over and beyond all the earnings of the boat; so that, on the 1st of August 1837, it required a payment of $138·84 on each share subscribed for, to be contributed, in order to pay the debts of the partnership, and equalize the loss among all the partners ; and that each of the defendants was liable to contribute $138·84, and interest, on every share held by him :   That the partners had, from the commencement of the business, been informed of their agents' doings and advances, and had been

requested to contribute their share to equalize said loss; but that the defendants had neglected so to do: That the defendants had acknowledged their liability to contribution; especially on the 22d of March 1831, at a meeting then held, when they accepted a report of a balance of debts against the partnership, reported to be $8411; and on the 7th of May 1831, when, at a meeting then held, they voted an assessment of $50 per share, to be appropriated to pay the plaintiffs, as the disbursing agents of the boat, for their advances; though said vote was afterwards reconsidered, without any collection being made.

The *prayer* of the bill was, that the property of the partnership might be sold; and that the accounts might be adjusted, to ascertain the amount of the defendants' respective liabilities; and that said amounts might be decreed to be paid to the respective plaintiffs, according to the sums due to each of them.

The *answers* of twenty five of the defendants admitted that they, with said Bartlett, Spooner and Covington, on the 3d of July 1828, signed the following agreement, and no other: "To facilitate the communication between Boston and Plymouth, it is deemed necessary that a steamboat be employed, and a wharf erected in Plymouth, the cost of all which is estimated at ten thousand dollars. Now, to carry into effect this object, it is agreed by the subscribers hereto, that they will take the number of shares set opposite their respective names, and will pay for each share one hundred dollars, to such person as may be appointed by a majority of interest; and that a meeting of the subscribers may be called, to organize the company, by any two of them, whenever the sum of eight thousand dollars shall have been subscribed:" That some of the persons, who signed said agreement, assembled on the 5th of August 1828, and passed the votes mentioned in the plaintiffs' bill; but they denied that notice of said meeting was given as in the bill is alleged, or that a majority in interest of those who signed said agreement were present or represented, or that those who were present or represented had authority to pass said votes.

The defendants admitted that the committee, mentioned in the bill, received of those who signed the aforesaid agreement

the sums set against their respective names, $8900 in all, but denied that the committee purchased said steamboat, wharf, and flats, for any of the subscribers to said agreement, except for the committee themselves; and they averred that the committee purchased said boat for their own use, and enrolled and registered it as their own, on the 16th of September 1828; and that the committee purchased the wharf and flats, and expensive stores, without leave of the defendants, or of any signer of the agreement aforesaid, except their own, and took a deed thereof, conveying the same to them alone, without mention therein, even that said committee were to hold the same to the use of, or in trust for, the signers of said agreement; and that after the death of said Jacob Covington, said Bartlett and Spooner, survivors of said committee, viz. on the 25th of April 1837, conveyed said wharf and stores to T. Jackson, jr. in mortgage, without any authority from the defendants.

The defendants denied that said committee ran said steamboat on the defendants' account, and alleged that the committee, with Josiah Robbins, Charles Brown, and Daniel Jackson, jr. ran the boat on their own account, and agreed in writing that they six alone would share the profit and loss; which agreement was as follows: "This agreement made this 12th day of November, in the year of our Lord 1828, by and between Josiah Robbins and Daniel Jackson, jr. of Plymouth, in the county of Plymouth and Commonwealth of Massachusetts, and Charles Brown of Boston, in the county of Suffolk, and State aforesaid, on one part, and James Spooner, Jacob Covington and James Bartlett, jr. of Plymouth, in the county of Plymouth, and Commonwealth of Massachusetts, on the other part, witnesseth, that whereas the said Spooner, Covington and Bartlett, are a committee to purchase a location and build a wharf in Plymouth, and purchase and establish a steamboat to run between Plymouth and Boston, for and in behalf of an association of subscribers for that object; and whereas it is probable that the said Spooner, Covington and Bartlett, in pursuance of said object, may find it necessary to contract debts, on account of said wharf and steamboat, over and above the amount subscribed for that

purpose, it is therefore agreed that we, the said Robbins, Jackson and Brown, do hereby agree, that in case the contracts of the said committee, for the abovesaid wharf and steamboat, shall exceed the amount subscribed for that purpose, then we will bear and pay to said Spooner, Covington and Bartlett, one half of the amount that their said contracts for the said wharf and steamboat exceed the amount subscribed for that purpose. It is the mutual agreement of the parties hereunto, that the above contemplated advances shall be paid equally by the sub scribing persons, and that all profits or losses, arising from such advances, shall be divided or borne equally by the subscribers hereunto.    To the full and faithful performance of all the within agreements, we respectively bind ourselves, our heirs, executors and administrators.

"In testimony whereof, we have hereunto set our hands and seals.

"James Spooner, [L. S.]   Jacob Covington, [L. S.]   James Bartlett, jr. [L. S.]   Josiah Robbins, [L. S.]   Daniel Jackson, jr. [L. S.]   Charles Brown, [L. S.]"

The defendants averred, that on signing the aforesaid agreement of July 3d 1828, it was understood that $100 per share was the extent of each signer's liability, and that said committee were not authorized to run the defendants into debt, nor to expend over $100 per share subscribed; and that the parties to the aforesaid agreement of November 12th 1828 took on themselves the liabilities of running in debt, and that the defendants never ratified or confirmed the incurring of debts beyond what $100 per share would pay.

The defendants (among many other things not necessary to be here stated) denied the equity of said committee's conduct, in taking said $8900, subscribed and paid as aforesaid, and paying therewith for the said wharf and flats, and taking a deed thereof to themselves, and thereby violating their trust, and embarrassing the defendants in coming to the possession of their rightful property therein.

The case was heard on the bill and answers, and the argu ment was had at the last October term.

*W. Thomas & E. Ames,* for the plaintiffs.

*Eddy & Coffin,* for the defendants.

WILDE, J. The plaintiffs' claim, as stated in their bill, is founded on an agreement between the parties, the construction of which is in some respects doubtful ; and, without taking into consideration the proceedings of the parties under the agreement, it would be extremely difficult to ascertain with certainty their relative rights and liabilities. The agreement is very short and indefinite, and it contains no stipulations as to the manner in which the business to which it relates was to be conducted It is as follows : " To facilitate the communication between Boston and Plymouth, it is deemed necessary that a steamboat be employed, and a wharf erected in Plymouth, the cost of all which is estimated at $10,000. Now, to carry into effect this object, it is agreed by the subscribers hereto, that they will take the number of shares set opposite their respective names, and will pay for each share $100, to such person as may be appointed by a majority of interest ; and that a meeting of the subscribers may be called, to organize the company, by any two of them, whenever the sum of $8000 shall have been subscribed."

Under this loose and very imperfect agreement, the subscribers, or some of them, after giving notice to the other subscribers of the time and place of their meeting, proceeded to organize the company, and thereupon chose a committee, with full powers to collect the money of the subscribers, and to carry into effect the objects of the association, according to their discretion.

Admitting that the company was thus legally organized, or, if not, that the proceedings at the first meeting were afterwards confirmed at any subsequent meeting of the subscribers, the first question to be decided is, whether the members of the association became chargeable as partners in a joint stock company, or were only joint tenants, or tenants in common, of the steamboat and wharf afterwards purchased by their committee.

On this point, the agreement is not explicit ; but the object of it is expressed with sufficient certainty. It was, to facilitate the communication between Boston and Plymouth, by the em

ployment of a steamboat to run between those places. But by whom it was to be employed, and who were to share in the profit and loss, after the boat should commence running, does not appear by the agreement. But we think it a reasonable inference, as the agreement is silent in this respect, that the understanding was, that the boat should be employed for the use and benefit of the company, in such manner, and upon such terms, as a majority in interest might direct. Admitting this to have been the understanding and intention of the subscribers, it follows, that as the boat was employed, by the authorized agents of the company, for their use and benefit, they were entitled to the profits and were chargeable with the expenses and the debts that were incurred in the prosecution of the enterprise. The several owners of a ship in distinct proportions, although tenants in common of the property, will become partners in a voyage, if undertaken on an agreement, express or implied, to share in the profit or loss that may arise thereon. And such an agreement, we think, may be implied from the proceedings of the parties in this case.

The next question for consideration is, whether the liability of the stockholders be not limited to the amount of the capital which they respectively contributed, or agreed to contribute, to the joint stock. The defendants contend that, at the time they subscribed the agreement, it was understood that their liability was to be thus limited; and they rely on an agreement here-after to be noticed, between the members of the committee, with Josiah Robbins and others, in confirmation of this under-standing of the parties. The plaintiffs' counsel admit that this might have been the expectation of the parties; but they con-tend that an express agreement to that effect would be no defence, in an action by a creditor of the company against a stockholder or partner, for a debt incurred in the business of the concern. And this is, unquestionably, the law of England and of this country, unless the creditor has notice of the limita-tion of the liability of the stockholders, they being partners, as stipulated between them. Whether a creditor, who, with a knowledge of such a restrictive stipulation, credits the company,

29 *

would be bound by it, may be doubted. Judge Story considers it as an open question ; but he intimates an opinion, that creditors, with a knowledge of such a stipulation, would be bound by it. He says, " if they have notice of the qualifying stipulation, and contract with reference to it, it may not be easy to assign a reason why it does not amount to an implied agreement to be bound by it, as much as if it were expressly agreed to." Story on Part. § 164. This, however, is not the question now to be decided, which is, whether such a restrictive agreement is not binding on the associates *inter sese*, and upon the managers, who are appointed to carry into effect the objects of the association. And we cannot doubt that it is thus far binding, and that none of the partners are liable to a claim of contribution which is founded on the violation of such an agreement. That there was such a restrictive agreement, and that it was well understood by the committee, appears clearly, we think, by their agreement with Josiah Robbins and others. That agreement expressly provides for all debts which might be con tracted by the committee, on account of said wharf and steamboat, over and above the amount subscribed for that purpose. And it was expressly agreed by the parties that the advances, so contemplated, should be paid equally by the subscribers to that agreement, and that all profits or losses, arising from such advances, should be divided or borne equally by them.

Now it is most certain that, by these advances, no debt was created, or was intended to be created, against the original stockholders. The advances were not made at their request nor in their behalf, but for the use and benefit of a new company, who expressly agreed to pay the same, and to divide the profits and losses arising therefrom. It was argued, for the plaintiffs, that the object of the new agreement was merely to relieve the committee, in a measure, from any losses they might sustain by reason of the inability of any of the original stockholders to pay their contributive liabilities for the contemplated advances ; and that the word " profits " was inadvertently inserted in the agreement. But this argument, or assertion, is wholly without foundation. The language of the agreement is clea., and no

part of it could be rejected, although it could be proved, by parol evidence, that it did not express the true meaning of the parties.

We are also of opinion, that the committee had no authority to make these advances on account of the original company.

According to this view of the case, the other questions dis cussed by counsel become immaterial ; and we are of opinion, that the defence is maintained on two grounds : 1st. Because the committee had no authority to make advances, so as to charge the stockholders with an amount exceeding that subscribed for. The subscribers agreed to pay $100 per share, and no more ; and the evidence is entirely satisfactory, to prove that such was the agreement and understanding of the parties. This restrictive agreement was binding upon the parties *inter sese*, and upon the committee ; for, although the committee had a discretionary power, it was limited, so as " to carry into effect the objects of the association." 2d. In the second place, it is perfectly clear that the advances made by the committee, on which the plaintiffs' claim for contribution is founded, was not in fact made for, and on account of, the original stockholders, but solely on their own account, or on account of the new company.

*Bill dismissed.*